**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>v.<br><br>Fabian Jose Martinez, et al.,<br><br>Defendants. | No. CR-23-00725-001-TUC-JCH (LCK)<br><br>**ORDER** |

Defendants have pled guilty to one count of conspiracy to transport illegal aliens for profit placing in jeopardy the life of any person. The issue before the Court is whether, for the purpose of applying a ten-level sentencing enhancement under U.S.S.G. § 2L1.1 ("death enhancement"), the Government has proven by a preponderance of the evidence that someone died as a result of the conspiracy. For the following reasons, the Court finds the Government has met its burden, and the enhancement applies.

**I.   Background**

Defendants Fabien Martinez, Rodolfo Orozco-Nunez, and Sabrina Dominguez (together "Defendants") have each pled guilty to one count of conspiracy to transport illegal aliens for profit placing in jeopardy the life of any person in violation of 8 U.S.C. §§ 1324(a)(1)(A)(v)(I), 1324(a)(1)(A)(ii), 1324(a)(1)(B)(i), and 1324(a)(1)(B)(iii). Docs. 109, 113, & 136. In their respective plea agreements, Defendants admit to conspiring and agreeing with each other to transport illegal aliens for profit and transporting individuals in trunks of vehicles during the course of the

1 conspiracy, placing in jeopardy the life of those individuals. *Id.* The parties agreed to a hearing before the Court where it would decide whether to apply the death enhancement. *See* Docs. 122 & 132.

On December 18, 2024, the Court held a Pre-Sentence Evidentiary Hearing regarding the application of the death enhancement. *See* Doc. 168. At the hearing, the Government presented evidence in the form of WhatsApp and Snapchat messages, cell site location data from the evening of August 2, 2021, and testimony by Homeland Security Investigations ("HSI") Special Agent Chad Lakosky and Federal Bureau of Investigation ("FBI") Special Agent Justin Swartz. *See generally* Evid. Hr'g Tr., Dec. 18, 2024.[1] The Court granted the parties leave to file written closing arguments. *See* Docs. 196, 211, 213, & 217. The Court finds the following facts by a preponderance of the evidence.

On August 2, 2021, at approximately 12:30 p.m., Defendant Martinez began coordinating an alien smuggling job with Defendant Brandon Sanders.[2] Ex. 1 at 6384. Martinez told Sanders there were five aliens in the load and directed him to put some of the people in the trunk if he needed to. Ex. 1 at 6384, 6390.[3] After Martinez reaffirmed he wanted Sanders to transport "[s]ome in the trunk if [he] could," Sanders asked if the aliens could "stay in the trunk that long." Ex. 1 at 6393–94. Martinez assured him "they should be fine." Ex. 1 at 6394.[4]

At around 4:45 p.m., Sanders picked up a group of six aliens. Ex. 1 at 6402. Three of them got in the trunk.[5] That day, the temperature was 100 degrees or higher depending

---

[1] The Court uses the abbreviation "Tr." for subsequent references to the official transcript from the December 18, 2024 Pre-Sentence Evidentiary Hearing.
[2] Defendant Sanders has pled not guilty and is pending trial. As such, he is not a party to this issue.
[3] When Martinez sent this message, Sanders had already sent Martinez a picture of his vehicle, which appears to be a red sedan. *See* Ex. 1 at 6385.
[4] Martinez also informed Orozco-Nunez that Sanders would be transporting "a few" of the aliens in the trunk. Ex. 2 at 6125.
[5] The Court infers three aliens were in the trunk from Defendants' WhatsApp messages. *See* Ex. 2 at 6161 ("I thought he had 4 in the back and two in the trunk . . . . I fill [sic] like if there was two in the trunk it would have been better."); Ex. 2 at 6163 ("I told [the aliens in the trunk] to get in my car so the two did and I seen the last one not moving . . . .").

1 on the location between the pickup point and the hotel where Sanders met Martinez and
2 Orozco-Nunez. *See* Tr. at 18:13–15. When Sanders was near Picacho Peak, about two
3 hours into the drive, he messaged Martinez, "There [sic] getting ancy [sic] in the trunk."
4 *See* Ex. 10 at 8; Ex. 1 at 6415. Sanders told Martinez the aliens had opened the trunk
5 while he was driving, and he had to pull the car over to re-close it. Ex. 1 at 6416. Five
6 minutes later, Sanders messaged that "[t]hey did that shit again." Ex. 1 at 6417. Martinez
7 instructed Sanders to "[t]ell them to stop." Ex. 1 at 6418.[6]

8 As Sanders drove, Martinez and Orozco-Nunez coordinated the aliens' drop off at
9 a Double Tree hotel in Tempe, Arizona. *See* Ex. 2 at 6155–56. Orozco-Nunez told
10 Martinez he would be driving a car that belonged to his girlfriend, Defendant
11 Dominguez. Ex. 2 at 6146. Orozco-Nunez later clarified he would be driving a grey
12 Toyota Corolla. Ex. 2 at 6157.

13 At 7:00 p.m., Sanders messaged Martinez that he was 18 minutes away from the
14 meet up point. Ex. 1 at 6420. At 7:17 p.m., Martinez messaged Sanders that he had
15 arrived at the meet up point. At 7:30 p.m., Martinez messaged Orozco-Nunez saying,
16 "Idk (I don't know) if that foo passed bro," "[h]e ain't moving," in reference to "the other
17 guy in the trunk." Ex. 2 at 6157–58. At 7:36 p.m., Sanders and Martinez exchanged the
18 following messages:

19 Sanders: He's making noise in the back
20 Martinez: He's bringing water for them rn (right now) and he said he has
21 something for the guy
22 Sanders: He needs air bro
23 Sanders: And to sit up how close is he

24 Ex. 1 at 6422. Once Orozco-Nunez arrived at the hotel at about 7:40 p.m., the messages
25 temporarily stopped. Ex. 1 at 6423; Ex. 2 at 6159.

26 At about 8:30 p.m., Martinez messaged Orozco-Nunez apologizing and offering
27 not to get paid. Ex. 2 at 6160.[7] Orozco-Nunez responded, "Bro I have my hands tied rn

28 ---
[6] Martinez also informed Orozco-Nunez the aliens had opened the trunk. Ex. 2 at 6156.
[7] Martinez's messages read: "Aye bro I'm so sorry idk wtf he was thinking bro I didn't

- 3 -

idk what to do," "[t]his never happened to me." Ex. 2 at 6160. Martinez agreed this was a "first" for him and diverted blame to Sanders, claiming "if there [were] two in the trunk it would have been better." Ex. 2 at 6161. Martinez suggested Orozco-Nunez "maybe say [he] found him in the street or something." Ex. 2 at 6161. Orozco-Nunez responded, "Idk bro I'm fucked rn the way I see it bro" and "It looks bad on me regardless." Ex. 2 at 6162. Orozco-Nunez told Martinez he and Sanders should have taken the people out of the trunk and put them in Martinez's car. Martinez responded that two of the aliens got in his car, but Martinez "seen the last one not moving so . . . [he] shook him and he didn't move," prompting him to call Orozco-Nunez. Ex. 2 at 6163. Martinez also told Orozco-Nunez that when Martinez last saw the alien being moved into Orozco-Nunez's car he "seen his stomach moving like he was breathing." Ex. 2 at 6163.

At 8:45 p.m., Sanders messaged Martinez inquiring about payment. *See* Ex. 1 at 6423. Martinez told Sanders he didn't know about payment yet because they "were trying to figure out what to do." Ex. 1 at 6423. In response, Sanders asked, "Is he awake?" Martinez responded, "Idk yet bro." Ex. 1 at 6424.[8]

At approximately 10:00 p.m., Orozco-Nunez texted Martinez, "27th ave Bethany savers." Ex. 2 at 6163. Martinez responded, "Ok bet you need anything?" Ex. 2 at 6164. Orozco-Nunez replied, "No I got it already." Ex. 2 at 6164. Cell location data shows Martinez and Orozco-Nunez met at a Savers store on Bethany and 27th Avenue in Phoenix between 10:19 p.m. and 10:27 p.m. *See* Ex. 10 at 14; Tr. at 122:4–13. They then drove to a remote area south of Phoenix on the Gila River Indian Reservation. *See* Ex. 10 at 15–16; Tr. at 122:14–123:11. They stayed in the area for at least 15 minutes[9] before

---

even know anything about that guy besides when I seen him then that's when I called you" and "Aye bro honestly I won't get paid like that shits crazy like my bad." Ex. 1 at 6160.
[8] Martinez and Sanders kept messaging regarding payment in the following days. On August 3, Martinez still didn't know about payment, and three days later, on August 5, Martinez told Sanders he didn't know if they would get paid for "the one who ran off and the other one." Ex. 1 at 6424–25, 6429. On August 11, 2021, after multiple missed calls and texts from Sanders, Martinez informed Sanders his boss, Orozco-Nunez, "didn't even get paid for that." Ex. 1 at 6438.
[9] Cell site location data puts Martinez and Orozco-Nunez south of Loop 202 and west of I-10, in a remote area on the Gila River reservation, from at least 11:07 p.m. until

returning to their respective residences. *See* Ex. 10 at 16–18. Afterward, Martinez messaged Orozco-Nunez, "Aye pa if you need the whip (car) cleaned lmk (let me know)." Ex. 2 at 6168; Ex. 10 at 18.

On August 5, 2021, Dominguez attempted to sell her Toyota Corolla, the car Orozco-Nunez drove to the Double Tree on August 2. *See* Ex. 11. Dominguez messaged a potential buyer, "I'm getting rid of my car cus [sic] of something lol (laugh out loud) nothing wrong with my car I wanna keep it tbh (to be honest)." *Id.* When the buyer asked if she would trade it, Dominguez responded, "I can not lol." *Id.*

Defendants continued to run alien smuggling loads after August 2, 2021. At first, Martinez instructed drivers not to put people in the trunk, telling one driver, "the trunk we don't do anymore because it's hot asf and we don't want these foos dying." Ex. 4 at 5747; *see also* Ex. 5 at 5880. Later, Martinez allowed drivers to transport people in trunks but instructed them to leave the aliens for no longer than 20 minutes, only transport one or two people in the trunk, make sure the aliens get air, and take people out of the trunk once the drivers were clear of immigration checkpoints. Ex. 6 at 3949; Ex. 8 at 6503. Sanders also continued to drive but told Martinez he would not put anyone in the trunk because he "[g]ot PTSD from that shit." Ex. 8 at 6504. Later, Sanders did put people in the trunk but said "that shit scares me now" and assured Martinez that he was letting the people out of the trunk and giving them water. *See* Ex. 9 at 6569, 6579.[10]

In October 2021, after an HSI investigation identified Martinez as the individual who coordinated a smuggling load with an undercover agent on August 26, 2021, an extraction of Martinez's phone revealed the messages related to the August 2, 2021 smuggling event. Tr. at 13:5–15:4. In about December 2021, HSI obtained search warrants for the cell location data for Martinez's, Orozco-Nunez's, and Sanders's phones. *See* Tr. at 81:5–16. Agents subsequently began cursory searches of the area on the Gila

---

11:23 p.m. *See* Tr. at 123:5–125:5; Ex. 10 at 16.
[10] Martinez seemed especially concerned about Sanders putting people in the trunk. During a load on August 19, 2021, Martinez texted Sanders seven separate times about taking care of the people in the trunk. *See* Ex. 9.

- 5 -

1 River Indian Reservation where the phones had pinged on the evening of August 2, 2021. Tr. at 81:17–19.[11][12] During those searches, agents drove around and looked for anomalies, walked the area, and checked trash heaps and debris. Tr. at 81:17–19. Between December 2021 and March 2022, agents searched the area several times, Tr. at 82:4–7, sometimes using cadaver dogs, Tr. at 82:8–83:10. Agents found clothing and trash discarded in the area but did not find human remains or evidence related to this investigation. Tr. at 83:11–84:6. Later, the FBI provided a secondary search location based on additional analysis of the cell phone location data. Tr. at 84:7–15. Searches in this area again came up empty. Tr. at 84:12–85:10. HSI never found a body or any identifying material for the person who allegedly died on August 2, 2021. Tr. at 85:11–86:17.[13] Photos taken during the searches show a vast, desolate stretch of desert with areas of brush, a riverbed, and a water reservoir. *See* Ex. 19; Ex. 20.

In October 2022 and January 2023, HSI agents interviewed Defendant Martinez concerning the events on August 2, 2021. *See* Ex. 14; Ex. 15. Throughout most of the interviews, Martinez claimed to not know or remember much of what happened on that day. *See id.*[14] At times, Martinez claimed he had been told the alien was moving and breathing after being moved to Orozco-Nunez's car and he thought "maybe he lived." *See* Ex. 14. Martinez also told agents someone had "probably" passed away. *See* Ex. 15. Martinez admitted to traveling to Maricopa with Orozco-Nunez and another unknown individual but said he did not know what happened there. Ex. 15. Martinez claimed he

---

[11] HSI became interested in this area when Agent Lakosky noticed Martinez's and Orozco-Nunez's phones traveling to the area after the meeting at Savers. Tr. at 50:8–19. Agents decided to search the area because it was a "very desolate area in the middle of the desert. Dark, no lighting, no housing in that area." Tr. at 50:8–14.

[12] As Agent Swartz explained at the Pretrial Evidentiary Hearing, cell site location data can help identify the *approximate* location of a cell phone at the time it transmitted a signal. Tr. at 108:9–19. In more rural areas, there are fewer cell towers and the coverage area for each tower is greater. *See* Tr.; 114:5–10. This means "there is a greater geographic area" in which the phone could be located during the interaction with the tower. Tr. at 115:5–13. The location is thus less precise and only provides information on the phone's general area. Tr. at 115:9–23.

[13] All information on the searches is based on HSI Special Agent Chad Lakosky's testimony at the December 18, 2024 Pre-Trial Evidentiary Hearing. *See generally* Tr.

[14] Martinez blamed his memory loss on a childhood head injury, but the defense has presented no evidence to support this claim. During his first interview, Martinez was able to identify cars similar to those used for the August 2, 2021 load. *See* Ex. 14.

- 6 -

was just a "follow car," and he stayed in the car while the other two killed their lights and "did what they did." Ex. 15. When agents asked why he thought Orozco-Nunez would go "all the way out to Maricopa," Martinez pointed to the picture of skeletal remains the agents had showed him as a ruse and said it could have been "to do that," but he thought it was to get rid of "clothes or whatever." Ex. 15.

## II.     Legal Standard

U.S.S.G. § 2L1.1(b)(7) provides for an increase to a defendant's offense level "[i]f any person died or sustained bodily injury . . . according to the seriousness of the injury." If any person died as a result of an offense, the guidelines provide for a 10-level increase. U.S.S.G. § 2L1.1(b)(7).

A "preponderance of the evidence standard is sufficient to satisfy due process for fact finding" under the sentencing guidelines regardless of the impact on the sentence. *United States v. Lucas*, 101 F.4th 1158, 1162 (9th Cir. 2024) (en banc). The Ninth Circuit has assumed, in dicta, that for an enhancement under U.S.S.G. § 2L1.1(b)(7)(D) to apply, "the relevant death . . . must be causally connected to dangerous conditions created by the unlawful conduct." *United States v. Herrera-Rojas*, 243 F.3d 1139, 1144 n. 1 (9th Cir. 2001).[15] The parties agree that to apply the "death enhancement," the Court must find by a preponderance of the evidence that (1) someone died during the course of the conspiracy and (2) the death was causally connected to the unlawful conduct. To satisfy the preponderance of the evidence standard, the Government must prove these facts are more likely than not. *See Lucas*, 101 F. 4th at 1164 (citing *United States v. Matthews*, 278 F.3d 880, 885 (9th Cir. 2002)).

///

///

///

---

[15] It is unclear whether direct or proximate causation is required under this standard. *See United States v. Ramos-Delgado*, 763 F.3d 398, 401 (5th Cir. 2014) (interpreting *Herrera-Rojas* as requiring "direct or proximate causation" to apply the § 2L1.1(b)(7) sentencing enhancement). The Court would find the Government has met its burden to prove causation under either standard.

### III. Analysis

#### A. Death

There is only one logical conclusion from the evidence presented: on August 2, 2021, an alien died because he spent over two and a half hours trapped with two people in a sedan trunk at temperatures over 100 degrees. Following Martinez's instructions, Sanders put three aliens in the trunk of his sedan during peak Arizona summer. Sanders thought this was dangerous, likely knowing, as anyone who has ever experienced a desert summer should, that temperatures in the trunk would be significantly hotter than outside. But still, Martinez, Orozco-Nunez, and Sanders allowed three people to be crammed into a confined space with no ventilation for the entire drive to Phoenix. When the passengers attempted to open the trunk, Sanders, encouraged by Martinez, thwarted their efforts. The aliens opened the trunk for the first time two hours into the drive. By the time Sanders reached the Double Tree and met up with Martinez half an hour later, one alien was nonresponsive.

The messages between Sanders, Martinez, and Orozco-Nunez don't clarify exactly what happened when the three met at the Double Tree. Martinez told Orozco-Nunez one of the people in the trunk wasn't moving at 7:30 p.m. But at 7:36 p.m., Sanders told Martinez that someone was "making noise in the back," and the person needed water and to sit up. It is unclear whether these messages are discussing the same person. It is clear, however, that upon arriving at the Double Tree, Sanders and Martinez kept at least one person who they knew was in distress in the trunk for 20 minutes as they waited for Orozco-Nunez to arrive. It is also clear that someone was in medical distress to the point where Martinez suspected he may have "passed," and that person was, at a minimum, unconscious when he was moved to Orozco-Nunez's car.

Despite Martinez's claims that he saw the alien breathing after being removed from the trunk, Defendants did not behave like people who had just experienced a close call. There is no evidence the Defendants sought medical help for the nonresponsive alien. Instead, Defendants acted like people who needed to dispose of a body. As

1 Martinez and Orozco-Nunez tried to "figure out what to do," their messages were panicked—"Bro I have my hands tied rn idk what to do . . . . Idk bro, I'm fucked rn the way I see it." Martinez even suggested to Orozco-Nunez that he say he "found [the alien] in the street or something."

Later that night, Orozco-Nunez and Martinez met up again. Orozco-Nunez texted Martinez a location, and Martinez, unsurprised, immediately offered to pick up supplies. They drove to a rural area on the Gila River Indian Reservation and "killed their lights" while Martinez kept watch. Afterwards, Martinez texted Orozco-Nunez offering to clean his car. Three days later, Dominguez tried to sell her car, admitting that she wanted to keep it, but she had to get rid of it cause of "something." Defendants engaged in alien smuggling routinely, and their panicked efforts to dispose of evidence are inconsistent with a simple "near-miss." Further, it is unlikely that Martinez and Orozco-Nunez would accept non-payment for the alien in distress had he eventually recovered.

Defendants' actions in the months that followed further implicate them. Though Martinez explicitly instructed Sanders to put people in the trunk on the day of the death, he explicitly instructed drivers *not to* afterward. Sanders continued to drive but also initially refused to use the trunk, claiming he had "ptsd." Defendants eventually resumed transporting aliens in trunks, but Martinez gave drivers explicit instructions to make sure they had air and water. Martinez was especially concerned when Sanders started to use the trunk again, asking repeatedly about the status of the aliens. Defendants argue this behavior could be explained by a close call, but Martinez explains it best: "the trunk we don't do anymore because it's hot asf and we don't want these foos dying." Ex. 4 at 5747.

Defendants argue the Court should take little credence in Martinez's unreliable, inconsistent statements. And it is true that Martinez was less than forthcoming in his interviews. Martinez initially told the agents that he thought maybe the alien had lived. In contrast, when asked why Orozco-Nunez would go "all the way out to Maricopa," Martinez pointed to a picture of skeletal remains and said it could be "to do that." But the Court can also consider what Martinez *did not* say. Martinez had an incentive to protect

himself. He said repeatedly he didn't want to go to jail, and he was clearly seeking to minimize his own role. Despite this, he never unequivocally said the alien survived. This is something he surely would have known had it happened. Claims of Martinez's childhood injury and memory loss cannot explain away this behavior. The messages show the August 2, 2021 load made an impact. Yet somehow, Martinez remembered what cars were driven on that day but not what he and Orozco-Nunez talked about at Savers. This is implausible. Martinez's statements are not those of someone who did not remember or someone who experienced a close call. They are those of someone who is faced with damning evidence and is tailoring his statement to avoid getting caught.

That agents never found a body also does not overcome the evidence that someone died. HSI agents were not able to search for the body for the first time until January 2022, five months after the death. Cell location data is imprecise, and the area covered by the cell towers that pinged Defendants' phones is expansive. The area was barren for what appears to be miles, *see* Ex. 19; Ex. 20, meaning the body could have been anywhere.

Defendants argue there are alternative explanations for all this evidence. When looking at each piece of evidence in a vacuum, they are right that there *could be* alternative explanations. But "could be" is not enough to overcome the overwhelming evidence showing someone probably died. Under a preponderance of the evidence standard, this is enough for the Government to meet its burden.

### B. Causation

Defendant's own messages prove they knew the alien died because he was transported in the trunk. At the Double Tree, Sanders explicitly told Martinez the person in the trunk needed air and Orozco-Nunez needed to hurry. After the death, as Defendants scrambled to determine what to do, Martinez blamed the incident on Sanders putting too many people in the trunk. Orozco-Nunez blamed it on Martinez leaving the alien in the trunk while they waited for him to arrive. The Defendants knew what the Court can infer from its own experience living in the desert for over 50 years. *See Schulz v. Pa. R. Co.*, 350 U.S. 523, 526 (1956) ("Jurors are supposed to reach their conclusions on the basis of

common sense, common understanding and fair beliefs, grounded on evidence consisting of direct statements by witnesses or proof of circumstances from which inferences can fairly be drawn.").

Defendants' subsequent alien smuggling loads also show the alien died because he was transported in the trunk. If unrelated, there would be no reason for Martinez to instruct drivers not to put anyone in the trunk only days after he insisted Sanders do the opposite. He would not have said the reason for this new policy was because Defendants didn't "want these foos dying." Defendants were scared of putting people in the trunk. They knew that if they did, they would have to make sure the passengers had air and water and only stayed in the trunk for a limited time. Otherwise, someone might die. With all signs pointing to a heat-related death, the Court finds by a preponderance of the evidence that the alien died because he was trapped in a sweltering trunk with two other people for nearly three hours. To quote the Government, "the facts speak for themselves."

**IV.    ORDER**

Accordingly,

**IT IS ORDERED finding** by a preponderance of the evidence that on August 2, 2021, an alien died during the course of Defendants' conspiracy, and his death was causally connected to Defendants' unlawful conduct. The ten-level sentencing enhancement under U.S.S.G. § 2L1.1(b)(7)(D) applies.

Dated this 11th day of February, 2025.

_____
John C. Hinderaker
United States District Judge